Filed 6/25/15  P. v. Daniels CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070580 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F08003) |
| v. | |
| TOMMY GENE DANIELS, | |
| Defendant and Appellant. | |

Defendant Tommy Gene Daniels appeals following conviction on multiple counts of lewd or lascivious acts upon five child victims (Pen. Code, §§ 288, subd. (a), 667.61, subd. (e)(5)[1]) who were in his home for daycare or "respite care."[2]  Defendant was sentenced to a determinate term of eight years consecutive to an indeterminate term of

_____

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[2] Respite care was described as a temporary live-in care for adopted children with behavioral problems, to give the adoptive parents a respite.

1

150 years. Defendant contends: (1) the trial court erred in allowing evidence of the Child Sexual Abuse Accommodation Syndrome (CSAAS); (2) the court erred in excluding evidence of victims' mental health issues; (3) the evidence is insufficient for several counts; (4) the trial court erred in positioning a uniformed officer near defendant during trial without any finding of necessity; (5) the cumulative effect of errors was prejudicial; (6) the court erred in ordering section 1202.1 HIV/AIDS testing; and (7) jail booking and classification fees were improper because there was insufficient evidence of defendant's ability to pay and of the actual administrative costs.

We reverse as to the HIV test order and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charged Offenses

Defendant, who was born in 1962, was charged in a second amended information with 12 counts of lewd or lascivious acts upon five children under age 14:

**Counts One and Two** alleged that defendant placed his finger in or on the vagina of victim A.G. with lewd or lascivious intent, on or about July 5, 2005, in two separate acts;

**Counts Three, Four, and Five**[3] alleged that between June 1, 2003, and August 31, 2007, defendant with lewd or lascivious intent (a) directed victim "K.N." to touch herself in the master bathroom, (b) touched K.N. in the living room, and (c) directed K.N. to touch herself in the bathroom;

**Counts Six and Seven** alleged that between December 1, 2002, and August 31, 2007, defendant with lewd or lascivious intent directed victim "H.N." to touch herself in two separate acts;

---

[3] The jury ultimately found defendant not guilty on Count Five, the bathroom allegation.

**Counts Eight, Nine, and Ten** alleged that between August 1, 2003, and December 31, 2004, defendant with the requisite intent (a) touched the vagina of victim "H.B.1"[4] in the bathroom, (b) touched her vagina in the bathroom in a separate act, and (c) touched her vagina on or about her birthday;

**Counts 11 and 12** alleged that between November 1, 2003, and December 31, 2004, defendant with the requisite intent directed victim "H.B.2" to touch herself in two separate acts.

The second amended information also alleged defendant had committed the offenses against two or more victims, bringing him within the one-strike law, section 667.61, subdivision (e)(5).

## Prosecution's Case-in-Chief

Defendant and his wife Brenda Daniels operated a daycare in their home, even after their license was revoked in 2003.[5]  Around 2002, they began also providing "respite care" by taking in other people's adopted children with behavioral problems. They also provided foster care under certification by a licensed agency, Positive Option, until their certification was revoked in 2003.  The victims were in daycare or respite care.

### Victim A.G. -- Counts One and Two

A.G. is the victim that first reported the abuse at defendant's home. Age 12 at trial, she went to daycare at defendant's home between 2002 and 2005.  A.G. and her parents testified to an incident on July 5, 2005, when A.G. was six years old.

A.G. testified she was napping behind a couch.  Someone moved her to a bed in a bedroom.  The next thing she remembered was defendant shaking her shoulders to wake

---

[4] Two sisters have the same initials.  We refer to them as H.B.1 and H.B.2.  H.B.1 is the older of the two siblings.

[5] Much of the evidence regarding revocation was presented in the prosecution's rebuttal case.  We discuss that evidence, *post*.

her up.  She did not want to get up, so she pretended she was still asleep.  Defendant continued shaking her shoulders and then placed his finger in her vagina and moved his finger around.  A.G. moved away, still pretending to be asleep, but defendant again placed his finger in her vagina and moved his finger around.  Defendant left the room.  A.G.'s vagina hurt.  On cross-examination, A.G. admitted she did not see defendant, because she did not open her eyes.  But she believed it was defendant because of the way the finger felt.  She had felt defendant's hands before; she described his hands as "kind of hard and big like a man's."

AG's father testified that when A.G. came home that day, she told him that defendant had touched her bottom and vagina.  Her father told her mother.  Her mother testified she asked A.G. what happened.  A.G. said she had been taking a nap in a bedroom, when defendant came into the room, called her name, put his hand down her pants, stuck his finger in her vagina (a word with which A.G. was familiar), and moved his finger.  A.G. said she rolled over and pretended to be asleep, and defendant left the room.  A.G.'s parents phoned the Danielses' home and left a message for Brenda to call them.  The parents then contacted a doctor, who contacted the police.

A.G.'s mother testified she left her children with the Danielses even after she learned their license was revoked, because it was her "understanding" the revocation was merely for "administrative stuff."  Defendant's wife was the primary caregiver, but defendant sometimes helped, as did their two older daughters.

Physician assistant Ana Ross, who had special training in child sex abuse, observed several areas of redness in A.G.'s vaginal area.  But the examination could not prove or disabuse sexual abuse.  A lack of proper hygiene could also cause irritation.

The jury saw a videotaped interview of A.G. at the Special Assault Forensic Evaluation (SAFE) Center.  A.G. said she was sleeping, and defendant put his finger in her vagina and moved it around, and then she woke up.  While his finger was in her vagina, she turned away from him, and his finger came out, but then he put it in again and

4

moved his finger around in her vagina. When asked what it means to be asleep, she said, "It means that your eyes [are] closed and you're not really moving." When defendant did this, she was "kind of asleep and awake," "in the middle." When his finger went in, she thought, " 'oh what's that,' " and heard defendant's voice.

**Victim K.N. -- Counts Three, Four, and Five**

K.N., age 15 at the time of trial, lived in defendant's home for a year or two but she did not remember how old she was.[6] She had therapy sessions there with a therapist, Mell LaValley,[7] with defendant present. Three or four times a week, defendant made K.N. touch herself in the master bathroom. She thought she was eight or nine years old the first time. Defendant's wife had taken most of the children to a circus or fair. Defendant took K.N. into the bathroom, told her to pull down her pants, and lie on her back on the floor. He got out some "medicine stuff" and told her to take some in her hands and rub her vagina. She hesitated. He took her hand in his hand and moved her hand back and forth, touching her vagina. After awhile, he let her leave the room.

Many times, K.N. was asleep in the living room and awoke to find defendant touching her vagina. She pretended she was still asleep but peeked and saw defendant and heard his heavy breathing. After a while, defendant would stop.

K.N. felt she could not say "no" to defendant because he was bigger, she felt intimidated by him, and she was scared.

Sometime during or before 2004, K.N. told her mother and/or Brenda that defendant had touched her inappropriately, and they then told therapist Mell LaValley,

---

[6] Her sister H.N. was around eight or nine years old when they lived in defendant's home, which would have made K.N. six or seven at that time.

[7] Mell LaValley was a licensed marriage and family therapist who counseled one of the Danielses' children, then used the Danielses' home for therapy sessions with her own clients, then referred those clients to the Danielses' home for respite care, and continued to counsel them at the Danielses' home. We discuss LaValley's testimony, *post*.

who did not believe it.[8]  Although K.N.'s mother became suspicious of defendant, she had K.N. return to defendant's home for a short time because (according to K.N.) her mother believed LaValley that K.N. had lied.

K.N. admitted at trial that lying was one of her problems.  While at the Danielses' home, she took medications every day but did not know the names of the medications.  If her behavior was not right, they would change the medications.

After K.N. left defendant's home permanently, she learned from her mother about A.G.'s accusations against defendant.  A year or two later, K.N. reported her abuse to her present guardian Carla DeRose.

The incidents were reported to the police in 2008.  A videotaped SAFE interview of K.N., then age 11, was played for the jury.

K.N.'s mother testified K.N. had behavioral problems with frequent lying, and her sister H.N. liked to get others in trouble and stole.  While the girls were in respite care with defendant, they were seeing a psychiatrist who prescribed medications for them.  The mother said Brenda told her not to believe K.N.'s earlier accusation against defendant.

**Victim H.N. -- Counts Six and Seven**

H.N., K.N.'s older sister, was age 17 at the time of trial and testified she lived at defendant's home for about a year when she was eight or nine years old.  She said defendant was charming and polite when she first arrived, but he changed thereafter.  He yelled at his wife a lot, cussed really loud, and seemed like a bully.

Defendant took her into the master bathroom, had her lie naked on the floor, told her to take a Vaseline-like substance, which he said was for therapy, and with his hand moved her hand up and down over her vagina.  He then told her to continue while he

---

[8]  As we discuss, *post*, LaValley testified that she did not make the mandatory report to the police because K.N. later recanted.

6

rubbed her chest.  He had her do this again on other occasions.  It happened a lot but she did not remember how many times.  She did not initially tell her mother, because she was afraid of defendant.  She said that while defendant was not mean to her, he was mean to his own children and to H.B.1.  She eventually told her mother after she stopped living at defendant's home and learned the same had happened to K.N.

On cross-examination, H.N. said she was sent to defendant's home because she was "throwing fits," and her mother could not control her behavior.  H.N. took medication to help control behavior while she lived at defendant's home.  When the medications did not work, others were substituted.  At defendant's home, H.N. had regular therapy sessions with Mell LaValley, in the presence of H.N.'s mother and either defendant or his wife.  H.N. admitted that one of her behavioral problems was that she lied and made up stories.

After leaving defendant's home, H.N. was sent to a Baptist school in Mississippi for a year and then she returned home.  She was still having behavioral problems and was sent to live with her current guardian.

H.N. was aware that H.B.1 and H.B.2 made allegations against defendant.

**Victim H.B.1 -- Counts Eight, Nine and Ten**

H.B.1, age 14 at trial, testified she takes Seroquel at night for attention deficit disorder.  Her adoptive parents sent her to live in the Danielses' home when she was five and a half years old, where she said there was a lot of physical and sexual abuse.  She was terrified of defendant, who yelled in her face during therapy and gripped her arms really tight.  She remarked that defendant "was really big and I couldn't do anything."  He wanted her to say she was mad when she was not mad.  But she later testified she was always mad, "raging inside."  She took medications that made her act weird.

H.B.1 testified that when she was in the bathroom, defendant would walk in on her, close the door, have her lie on the floor after removing her clothes, and touch her

skin with his hands. She said she "shut down" most of the time; she tried to block it out by not thinking about it and did not let herself remember.

H.B.1 became nonresponsive on direct examination and said she was uncomfortable talking about this in the presence of so many strangers. She eventually acknowledged defendant touched her vagina. It happened more than once, but she did not keep track.

When asked if a touching occurred around her sixth birthday, H.B.1 said, "I didn't remember, myself, but [my sister] told me that she remembered --." The trial court sustained a hearsay objection. H.B.1 then testified that she remembered being on defendant's waterbed around her sixth birthday. She would not respond to the prosecutor's questions about what happened.

In a video of the SAFE interview played for the jury, H.B.1 told the interviewer that the day before her sixth birthday, she was lying on defendant's waterbed, watching the fish in an aquarium,[9] while other people were occupied elsewhere in the house. Defendant was pacing back and forth at the end of the bed. He pulled off her pants and underpants. She closed her eyes tight. She felt him put his finger in her. When defendant was done, H.B.1 got dressed, and defendant said, "That's your surprise birthday present."

H.B.1 testified the respite care children were not allowed to talk in their bedroom. If they did, they would get a cold shower and have to sleep in wet clothes. If they got in trouble, they would have to do headstands or walk on their knees as punishment.

H.B.1 did not tell her parents when they came to visit because defendant or someone from his family was always there, he had threatened that she better not tell anyone, and she thought her parents had sent her there for punishment.

---

[9] Two of the other victims did not remember seeing fish or an aquarium in defendant's bedroom.

H.B.1 disclosed the abuse to her new caretaker, Carla DeRose, who had already heard about it from other children. H.B.1 testified that Carla told her defendant had abused 150 girls and there was proof on his computer.

H.B.1 testified defendant made her have sex twice with a boy named John who lived in the house.

Once H.B.1 sustained a large "five-star" handprint mark. She remembered telling the interviewer about it, but did not remember defendant causing it. She said she remembered "being hit with objects, like scratchers and stuff." H.B.1 and H.B.2's adoptive mother testified that in December 2004, she felt an urgent need to bring the girls home. She retrieved them and discovered a black-and-blue bruise in the shape of a large handprint on H.B.1's left leg.

H.N. told H.B.1 that defendant forced H.B.1 to act out sexually with other female children at the house, but H.B.1 did not remember that and did not know if this was true or not. H.B.1 said defendant took pictures of her.

Pediatrician Dr. Angela Rosas examined H.B.1. The examination was completely normal, which was inconclusive as to whether sexual abuse had occurred.

**Victim H.B.2 -- Counts 11 and 12**

H.B.2, age 13 at trial, is one year younger than her sister H.B.1. H.B.2 testified to events that occurred when she was five years old and lived at defendant's home. When the prosecutor asked if anything inappropriate happened there, she said, "I know he [defendant] made us touch ourselves." The prosecutor asked, "And so how would . . . that happen?" She said, "There was I think the office or -- I think -- one second." After a long pause, she started crying and said, "I can't do this." When she regained her composure, H.B.2 testified that on multiple occasions (more than once a week), defendant made her touch herself in the office, or a room that had computers, chairs, and desks. There was an attached bathroom where defendant retrieved Vaseline. Defendant locked the office door, had H.B.1 and H.B.2 get undressed and lie back on the carpet. He

9

gave them Vaseline to put on their hands and told them to touch themselves. H.B.2 touched her front private part with her fingers. When defendant told them to stop, they got dressed and resumed whatever they had been doing.

Defendant said not to tell anyone, and H.B.2 did not tell her parents because she was scared. She eventually told her foster mother Cheryl and then told her parents.

On cross-examination, H.B.2 said she was currently taking medication, Seroquel XR, and had been for a little over a year, to help calm her down and make her feel "safer after a while."

### Description of the Behavioral Problems of H.B.1 and H.B.2 by Their Adoptive Mother

The adoptive mother of H.B.1 and H.B.2 testified H.B.1 and H.B.2 developed behavior problems and were sent to live at defendant's home through referral from LaValley. H.B.1 was placed there in August 2003, and H.B.2 went in November 2003. The adoptive parents paid defendant over $30,000 and paid LaValley over $10,000 for therapy. The mother put a video monitor in the room where the girls slept. She was aware that a house rule was that the children would not be fed if they disobeyed; they would have to wait for the next meal to get any food. The girls' mother knew little about "therapeutic homes" and trusted that the Danielses knew what they were doing.

The mother acknowledged H.B.1 and H.B.2 both had a tendency to lie. H.B.1 was prescribed various medications, e.g., Risperdal, Abilify, and Focalin, while at the Danielses' home, which was changed based on a psychiatrist's recommendations.

For the five years after she took H.B.1 and H.B.2 out of the Danielses' home, the girls lived with their adoptive parents, but they continued to struggle with behavioral problems and were eventually placed in separate foster homes, where the girls for the first time disclosed the sexual abuse.

10

**Prosecution Expert on CSAAS**

Licensed psychologist Dr. Anthony Urquiza testified that CSAAS is not used to determine whether a child has been sexually abused, but rather as an effort to dispel any myths, misunderstandings, or misconceptions about how such a child should react or behave. The doctor acknowledged CSAAS is more of a pattern than a "syndrome." It has five parts: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction of an allegation of abuse.

Dr. Urquiza began by explaining what he called a fundamental characteristic of child sexual abuse. Most sexually abused children are abused by somebody with whom they have an on-going relationship -- somebody who is bigger, stronger, and more powerful than the child.

The secrecy component explains why children do not disclose abuse. Sometimes overt threats are made, e.g., if you tell, something bad will happen to you, or if you tell, I'll hurt you. In response, the child does not disclose. Sometimes, there are no overt threats, but rather the child does not disclose because the child is intimidated by the bigger, stronger perpetrator. Sometimes a coercive strategy is used. Special gifts are given or there is a positive relationship between the child and the perpetrator the child wants to maintain. Or the child is coerced by misinformation, e.g., suggesting to the child that this is normal behavior. Sometimes children do not disclose because they fear bad things may happen in their life, they might get in trouble or they will not be believed, so in the child's mind it is smarter not to disclose.

The helplessness component of CSAAS explains that it is unreasonable to expect a child to keep himself or herself safe from an abuser who is bigger, stronger, and has on-going access to the child. The child feels that if the person who is responsible for protecting her is the one abusing her, then there is not anything the child can do. The abuser has the control and power.

11

In discussing entrapment and accommodation, Dr. Urquiza explained since there is nothing the child can do about the abuse, the child learns to cope with their feelings of shame, disgust, fear, embarrassment, and humiliation. One way to manage those feelings is by disassociation or shutting those feelings down. While some children break down and cry, others are successful in disassociating or suppressing their feelings without showing distress. And during the act of abuse, some children disengage themselves, essentially go numb, lie still, or pretend to be asleep as a way to cope. As an example, Dr. Urquiza discussed a patient who said he stared at a tree outside of his bedroom window every time he was sexually abused.

As for delayed disclosure, Dr. Urquiza testified that it is related to secrecy. "A lot of people have the misperception that if you're abused you're going to tell somebody right away," but that "doesn't happen very often." Most children delay disclosing sexual abuse, and the closer the relationship or access the perpetrator has to the child, the more likely it is that the delay will be longer. Regarding unconvincing disclosure, Dr. Urquiza explained that sometimes the disclosure is a process beginning with a vague, nondescript disclosure and then the child will say more if the child feels supported. But when there is more information given in subsequent versions, the information looks unconvincing, as if the story is made-up. Also, children have a harder time estimating frequency and duration of events or recalling specific dates and this is recognized as part of the unconvincing disclosure component of CSAAS.

Finally, retraction does not mean the child lied, because an estimated 20 to 25 percent of children who disclose sexual abuse recant. Children recant because pressure is imposed upon them to keep quiet or take back the allegation. "Maybe mom says . . . if you keep this up then Uncle Bob will go to jail."

According to Dr. Urquiza, false accusations of sexual abuse make up only one to six percent of known cases. Most false accusations come not from the child, but from a parent in a custody dispute.

12

Dr. Urquiza testified that CSAAS is consistent with his experience in his practice and the research literature. He uses CSAAS to train the clinicians in an internship program. He has frequently treated child sexual abuse victims who have been on medications for psychiatric disorders. The CSAAS characteristics are the same for such children. He opined that there is no difference between children who are on medications and children who are not.

The doctor testified that he has never interviewed or even met the victims in this case. Nor has he read any police reports related to the case. And he said that it is inappropriate to use CSAAS to determine whether a child had, in fact, been sexually abused.

**Defense Evidence**

**Defendant's Wife - Brenda Daniels**

Brenda testified she and defendant have one biological child of their own, and they have adopted several children with behavior problems. Their social worker referred them to therapist Mell LaValley.

The Danielses also provided foster care. They were certified by and worked under the umbrella of a foster agency, Positive Option.

The Danielses also provided "respite care" for which they were paid up to $1,800 per month per child and received referrals from LaValley, who had counseled the Danielses with their own children and suggested the respite care idea.

Brenda testified the victims had issues with lying and manipulation. She said they were "crazy liars," meaning they would make blatantly false statements such as doing something in front of the adults and then denying they did it. One threw her own feces at the living room wall and piano, and another was prone to "stir up the pot." Brenda said she never saw any inappropriate conduct by defendant and if she had, she would have called the police. Defendant spanked their own child and adoptive children but never hit the respite children.

13

Brenda said she did not report K.N.'s first allegation of molest because K.N. recanted and said it was not true and she had just been mad at defendant.

Brenda acknowledged that their daycare license and foster care certification were revoked in 2003. Additionally, their application to obtain their own foster care license was denied. When asked whether there had also been an order excluding defendant from employment in or contact with clients of a licensed community care facility, she said, "I believe so. I really don't remember."

**The Therapist - Mell LaValley**

LaValley testified that she is a licensed marriage and family therapist and works mainly with adopted children and their families. After counseling the Danielses' own children, LaValley asked if she could use their home for sessions with H.B.1 and H.B.2 who lived over three and a half hours away. She referred many children to the Danielses' home for respite care, including four of the victims in this case. H.N. started respite care in December 2002; K.N. in the summer of 2003; H.B.1 in August 2003; and H.B.2 in November 2003.

LaValley testified she did not receive a "kickback" but rather made the referrals in the children's best interests. LaValley conducted her therapy sessions with those children at the Danielses' home, where she spent about six hours a week. LaValley's "going rate" for therapy was $80 per hour. LaValley had defendant or his wife sit in on therapy sessions with the respite care children, because she viewed them as sort of "cotherapists."

LaValley was aware that the Danielses' daycare license and foster certification were revoked in 2003, but she kept referring children to the Danielses for respite care until 2005 when the Danielses stopped taking in children. According to LaValley, respite care did not require a license. It was her "understanding" that the only reason for the license revocation was that defendant supposedly made a comment, " 'over my dead body,' " when told the foster agency was going to remove a foster child from his home. However, her information about the revocation came from the Danielses. LaValley

14

testified she did not remember if she disclosed the revocation when she recommended the Danielses to parents, but she believed parents did their own screening. She indicated she would not have kept referring children or working in defendant's home had she known the revocation order also excluded defendant from working in any licensed community care facility or having contact with clients of a licensed community care facility.

From her own experiences in the Danielses' home, LaValley viewed them as good people and had "absolutely no concerns" about the care children received. According to LaValley, the children never appeared afraid or upset. There are not a lot of people willing to provide respite care. LaValley testified the four victims in this case were liars and manipulators and were seeing a psychiatrist who prescribed medications for them. LaValley said K.N. lied about watching R-rated movies to try to get the Danielses in trouble. H.N. took candy from her mother's purse and then lied about it.

LaValley testified that, as a licensed marriage and family therapist, she is required by law to report suspected child abuse. She did not report K.N.'s accusation to police because K.N. recanted, and LaValley did not believe the accusation anyway. However, LaValley admitted she never asked K.N. what happened and never met with K.N. alone. Instead, LaValley had defendant's wife Brenda present, as well as K.N.'s mother. When K.N. confirmed she had told Brenda that defendant touched her inappropriately, Brenda told K.N. "soft and gentle" that it was important to tell the truth, no matter what, and she was not in trouble. LaValley testified she handled it this way because she suspected K.N.'s accusation was a lie. LaValley testified that if she had asked K.N. what happened, "I think based on the dynamics of [K.N.], what -- psychodynamically and her behaviors, which is severe lying, that -- phrasing it that way would have opened up for, yes, slam dunk, I can lie about this. So we took a very different approach but one that would set it up where she could tell the truth. [¶] And if there had been anything more, any questions that I had, I would have pursued it. And I didn't because I had no reasonable suspicion at that time." LaValley said K.N. was not crying or upset when she recanted. She said the

15

three adults in the room "all agreed" the recantation was true. LaValley did not memorialize the meeting in writing.

**The Children's Medications**

Psychiatrist Jeremy Colley testified as a defense expert that Risperdal, Geodon, Abilify, and Seroquel were approved for or used off-label to treat schizophrenia, bipolar mania, and disruptive behaviors associated with autism. These drugs have a high rate of somnolence or sedation. Somnolence and sedation affects the memory process, because of the resulting inattention to stimuli. As Dr. Colley explained, "if [] perceptions never make it to the part of the brain where the memory is stored then the memory never get [*sic*] there and you can't go on to retrieve it." Schizophrenia and bipolar mania cause severe disruptions in the ability to perceive reality accurately and communicate with language and behavior. Topamax, Depakote, and Trileptal treat seizures; Zoloft is an anti-depressant; and Focalin addresses attention-deficit hyperactivity. All have side effects of sedation and impairment of memory or cognitive functioning.

**Defendant's Testimony**

Defendant denied all charges. He testified he is six feet two inches tall and weighed 410 pounds at the time in question (but weighed much less at trial). He was honorably discharged from the Air Force in 1986 after a four-year stint. He then sold computers, then sold cars, then injured himself working for a rent-to-own company and was on disability for four years. He then had several other jobs. In February 2005, the Danielses started a cleaning business. Defendant went to seminary school and became a pastor of his church around October 2005.

The Danielses started doing respite care at LaValley's suggestion, after they had success with their own adopted children who had issues. The foster agency had sent the Danielses for training in dealing with difficult children. Brenda was the primary caretaker. Defendant and Brenda are the only adults in their household; only their

16

teenage daughters would be present when he and his wife are gone. Defendant admitted that he has a loud voice and would yell at the children sometimes.

Defendant testified that on July 5, 2005, he came home at lunchtime, saw A.G. asleep on the floor, tried to wake her without success, and had his daughter move A.G. into the daughter's bedroom. LaValley arrived for a therapy session with a different child. Defendant went down the hall to use the restroom. He opened the bedroom door to let the cat into the bedroom, then shut the door. He did not enter the bedroom. He then joined the others for the therapy session. Around 5:00 p.m., A.G.'s mother phoned and said in an urgent, distressed voice, that she wanted to talk to Brenda, but Brenda was not there. Defendant phoned his wife and told her. After awhile, Brenda came home and said she went to A.G.'s home and the police were there.

After A.G.'s allegation, defendant and his wife were "terrified" and decided to stop bringing children into their home.

Defendant denied touching H.N. on her birthday and said she was not even there on her birthday.

Defendant spanked only his own children. With the other children, the Danielses used "natural consequences." For example, to handle a child who lied, the Danielses would ask if the child wanted broccoli or ice cream for dinner. The child would say "ice cream" but would be given broccoli. When the child, mouth agape, would ask why the Danielses were doing that, they would say, " 'We thought you were playing the lying game.' " Other consequences were that the child had to do jumping jacks, walk on her knees, or hold the plank position for 10 or 20 seconds.

Defendant testified that he told all prospective respite care parents about revocation of the daycare license and foster care certification. He testified he told them the reason was because there was "an allegation that I had threatened someone with a gun," and "an allegation of misappropriation of funds." Defendant considered these matters "allegations" despite the administrative law judge's (ALJ) findings that the

allegations were true. He said they would have appealed but did not have the funds or the "heart" to do it. His attorney showed him the order and that is when he learned he was excluded from employment in a licensed community care facility and that he was precluded from having contact with clients of any licensed community care facility. He did not say when he was shown the order.

**Psychological Evaluation of Defendant**

Psychologist Eugene Roeder testified he conducted a psychological evaluation of defendant and opined defendant is well-adjusted, with some obsessive-compulsive personality characteristics, but he did not demonstrate any psychological difficulties, personality disorders, or characteristics that the doctor would expect to find in a child molester. Research on child molesters show they generally have some history of sexually deviant behavior and some identifiable psychological problems.

**Defense Expert Regarding CSAAS**

Defense expert Dr. William O'Donohue testified to his opinion that CSAAS is "junk science" with multiple problems and is not generally accepted in the scientific community of mental health professionals. He gave examples of problems, e.g., CSAAS was not derived from a scientific study but instead from personal experience and anecdotal evidence, and CSAAS says it is common for child molest victims to recant, whereas studies have shown only four to 20 percent recant. However, Dr. O'Donohue agreed that delayed reporting is common, though he criticized CSAAS for being vague about what constitutes "delay." Dr. O'Donohue said children are naturally suggestible and can come to believe something happened that did not happen. Children with mental health issues are even more suggestible. "Children that either have cognitive problems, that have behavioral problems such as oppositional defiant disorder, conduct disorder, children that have problems processing information like with attention deficit disorder, attention deficit disorder with hyperactivity could have a higher rate of suggestibility.

18

Individuals who are schizophrenic, children who are schizophrenic, who have poor reality context are the highest."

**Other Witnesses**

D.M., age 20 at the time of trial, was the boy with whom H.B.1 said she was made to have sex by defendant. D.M. sometimes went by the name John. D.M., who referred to defendant as his father (although not biological or adopted), denied that this ever happened. In 2005, he was 13 years old. D.M. had lived with the Danielses from age 10 to age 20, with the exception of six months. He was still living with them at the time of his testimony.

Five defense witnesses, including former clients, testified they knew defendant, considered him an honest person, disbelieved the allegations against him, and would feel comfortable leaving their children or grandchildren with him. One witness, a church board member who knew defendant in his capacity as pastor of the church, was asked on cross-examination if her opinion of him would change if she knew he had threatened a foster agency worker with a gun if the worker came to take back a foster child. The witness said, "It would depend on the circumstances and why the social worker wanted to take the child away." Another witness, who had her child in defendant's daycare years earlier and had borrowed money from defendant, simply answered, "No," when asked if her opinion would change if she knew defendant had threatened a state worker with a gun for trying to take back a foster child.

<strong>Prosecution's Rebuttal Evidence</strong>

In 2003, the Danielses' daycare license was revoked, and the foster agency dropped them, for reasons -- disputed by the Danielses -- including misappropriation of funds, relating to the retention of agency overpayments, and child endangerment, relating to defendant's threat to use a gun to prevent the foster agency from taking back an infant the Danielses wanted to adopt. Defendant was precluded from future employment at any licensed community care facility or having contact with clients of a licensed community

care facility. The Danielses nevertheless kept giving respite care, and LaValley kept making referrals and getting paid for counseling the "respite care" children in therapy sessions conducted at the Danielses' home in the presence of either defendant or his wife and a parent of the child.

Joseph Kovill, a clinical psychologist and CEO of Positive Option Family Service, testified Positive Option is licensed for community care and certifies families to serve as foster homes. They certified the Danielses' home for foster care but had nothing to do with the Danielses' other child care activities.

In January 2003, while Kovill was Positive Option's clinical director, he heard rumors "from the community at large" criticizing the agency for running a "boot camp for children." Kovill visited the Danielses' home, which at the time had one foster infant, Paul M., whom the Danielses hoped to adopt. Kovill was concerned about the quality of care he saw. Two children on one side of a table were eating Kentucky Fried Chicken, while three children sat on the other side of the table -- one eating spaghetti with nothing on it, the second eating green beans only, and he could not recall what the third child was eating. Defendant's wife asked who wanted an apple fritter, and the two KFC children clamored for it, while the other three sat silently, without moving, hardly looking up from their plates. Defendant's wife was talkative with Kovill until defendant entered the room, at which point she stopped talking. Defendant was an uncomfortably forceful presence.

Kovill reported his concerns to the County and Community Care Licensing (CCL) and was told to remove the infant from the Danielses' home. This happened after the Danielses had expressed their intent to leave the agency, which happened after Positive Option started investigating the "boot camp" rumor. Kovill testified there was also a problem with defendant not returning about $3,000 or $4,000 of overpayments received from the County, which defendant claimed he did not owe, but Kovill said the money was "not a big issue."

20

Kovill acknowledged that the social worker who made weekly visits to the Danielses' home, Karen Pino-Smith, turned in "glorious reports" about the Danielses. Kovill did not consult her about the decision to remove the infant, because she had already shown herself to be untrustworthy and was on probation for violating rules and regulations by placing a foster child in her own home, which was a conflict of interest, and then paying the Danielses to provide daycare for that child.

William Darnell was the Positive Option staffer who physically removed the infant Paul M. from the Danielses' home on January 17, 2003. Darnell testified he phoned to inform the Danielses that he was coming to remove the child. Defendant immediately became irate, yelling, " 'Over my dead body will that child leave here,' " and accusing the agency of retaliation for reports defendant supposedly made against the agency. Darnell checked with his supervisor, then he tried phoning again several times. Each time, defendant became more and more angry, threatening to sue the agency and saying he had " 'a gun if anybody thinks they're coming here to take this kid.' "[10] Defendant also said the infant was not there and claimed he did not know where his wife had taken the infant. Defendant kept referring to "Joshua." Darnell asked who Joshua was because the infant's name was Paul. Defendant said they renamed the infant, and his real name was now Joshua.[11] After several conversations, Darnell felt defendant would relinquish the baby peacefully, and he eventually picked up the infant around 1:00 a.m.

ALJ Ann Sarli testified that in May 2003 she presided over an administrative hearing initiated by the Community Care Licensing Division (CCL), following which she

---

[10] On cross-examination, defendant denied saying he had a gun when the foster agency worker called to remove the child. He claimed he just said, " 'Over my dead body.' "

[11] Defendant had testified on cross-examination by the prosecution that they did not change Paul's name to Joshua. He said Joshua was just a nickname, but they had talked about changing the name if the adoption went through.

21

(1) revoked Brenda Daniels' child care license, (2) revoked Brenda Daniels' family home certification, (3) denied Brenda Daniels' application to operate a foster home, and (4) ordered that "Tommy Gene Daniels is excluded from employment in or contact with clients of a licensed community care facility."

### Surrebuttal Witness

Former Positive Option social worker Karen Pino-Smith testified she made weekly visits to the Danielses' home for about a year and a half to two years, during which she never had any concerns about the way the Danielses were treating the children. Pino-Smith herself sometimes paid the Danielses to babysit for Pino-Smith's own foster child.

### Verdict and Sentencing

The jury found defendant not guilty on Count Five (alleging defendant directed K.N. to touch herself in the bathroom) but guilty on all other counts. The jury also found true the multiple-victim allegation.

The trial court sentenced defendant to a determinate term of eight years on Count One, followed by a consecutive indeterminate term of 150 years to life (15 years to life for each of the other ten counts).

### DISCUSSION

### I. Admission of CSAAS Evidence

Defendant argues admission of CSAAS evidence was so irrelevant and prejudicial that it violated his right to a fair trial and due process of law. We disagree.

### A. Background

Defendant moved in limine to exclude all CSAAS evidence on the grounds that it was controversial and not designed to determine the truth of the allegations and could mislead the jury; that no misconceptions remain in 2011 about child sex abuse victims' behavior; that CSAAS has too little empirical support; and that CSAAS was irrelevant because the study developing it as a diagnostic tool did not include children with psychiatric and mental health histories, and four of the five victims in this case had

22

significant mental health problems. The defense further argued that, if the court allowed CSAAS evidence, it should do so for the limited purpose of disabusing jurors of specific, identified misconceptions about how a child reacts to molestation. The defense alternatively sought exclusion under Evidence Code section 352 of all CSAAS evidence as more prejudicial than probative, except for a stipulated statement to the jury that "[i]f Dr. Urquiza was to testify, he would indicate that delayed disclosure of sexual abuse is not inconsistent with children who have been molested."

The prosecution opposed the motion, arguing the expert's testimony was relevant to explain the seemingly paradoxical behavior of the victims with respect to all five CSAAS categories -- secrecy, helplessness, entrapment/accommodation, delayed or unconvincing disclosure, and retraction. The prosecutor asserted defendant was a resident molester in a position of power and authority over the victims; at least four victims were subjected to an alarm system that essentially tethered them to their beds; defendant threatened one of the victims and used physical force as punishment on more than one victim; and four victims delayed disclosure. The prosecutor cited case law that identifying the myth or misconception to be addressed by the proffered CSAAS evidence does not mean the prosecutor must expressly state on the record the evidence which is inconsistent with molestation. Rather, it suffices if the victim's credibility is in issue due to the paradoxical behavior, including delayed reporting.

At a hearing on the motion, the trial court said there were two requirements for admissibility -- (1) the prosecutor must identify the misconception that the evidence is designed to correct, and (2) the testimony must be limited to explaining why the victim's behavior is not inconsistent with abuse. The prosecutor stated she wanted to present the expert's testimony after the victims testified, as she expected the defense to challenge the victims' credibility on cross-examination. Her initial expectation was to use all of the CSAAS categories except retraction.

The defense argued CSAAS does not account for children with psychiatric and/or mental illness issues. Dr. Roland Summit, who wrote the seminal article on CSAAS, has repeatedly stated in his subsequent writings that CSAAS involves "normal" children. This case involves children with significant mental health issues. Defense counsel argued the only potential relevance of CSAAS evidence in this case was on the issue of delayed disclosure, and the defense was willing to stipulate that abused children sometimes delay in disclosing the abuse.

The prosecutor was not interested in the proposed stipulation. And she noted she would be making a motion to exclude mental health evidence at trial.

The trial court ruled CSAAS evidence would be admissible in the prosecution's case-in-chief if the misconception it was designed to correct was identified, and the CSAAS evidence had to be limited to explaining why a child's behavior is not inconsistent with abuse. The court said the prosecutor had identified four of the five CSAAS categories (all except "retraction") as the target misconceptions.

Later, as the court and counsel discussed whether the court should allow evidence of the victims' psychiatric diagnoses, the court asked the prosecutor about defendant's desire to question applicability of CSAAS to children with mental health issues. The prosecutor said she did not know what Dr. Urquiza would say but expected defense counsel could call and ask him. The trial court tentatively expressed its view that psychiatric diagnoses were inadmissible.

After the victims testified at trial and before Dr. Urquiza testified, defendant renewed his objection to the CSAAS evidence. He invoked his previous arguments and added a new one -- that voir dire did not reveal any juror misconceptions necessitating the evidence, and some prospective jurors stated in the questionnaire that they themselves were child victims who had delayed disclosure. The prosecutor objected to reliance on voir dire, expressed doubt that any past victims had been seated on the jury, and identified the misconceptions as relating to delayed disclosure and unconvincing

24

disclosure that changes over time. The prosecutor then stated four CSAAS categories were relevant here, and possibly the fifth (retraction) would become relevant after LaValley testified about K.N. retracting her accusation. When the court noted defense counsel had already disclosed the retraction in his opening statement, the prosecutor said she was identifying all five CSAAS categories as relevant. "The secrecy prong that talks about things that the perpetrator will do to help insure that a secret is kept including threats, and we had at least one child talk about don't tell or I'll find you. I know where you live. [¶] Regarding the next prong, helplessness, in situations where the individual [is] responsible for protecting the child. So when they are there, and the defendant and his wife are the caregivers, and that's the very person perpetrating the crime that there is a sense of helplessness. [¶] The entrapment or accommodation. We had one child talk about how she would shut down when the conduct would happen, one or more other victims talking about pretending to be asleep. And that applies to that prong. The delayed and unconvincing disclosure that we have already talked about and that we have seen with four witnesses. [¶] And I would dispute what the defense says. I think some of the questions have insinuated that you talked to Mell La[V]alley. She was there to help you. You didn't tell her. You had these opportunities to, you know, be at home with your [mother and father], go to church with them. So I think that through the question that that insinuation is there. [¶] . . . [¶] And finally the retraction, it would be really in anticipation of what Mell La[V]alley or perhaps Brenda or the defendant himself will say that [K.N.] took it back."

The trial court overruled the defense objection to the CSAAS evidence, finding the requirements for admissibility had been satisfied.

On November 21, 2011, four days after Dr. Urquiza testified, the defense filed a written motion in which it asserted surprise at the doctor's testimony about a Canadian

25

study that few child sex abuse allegations are false,[12] and defendant asked the trial court to "instruct the jury as soon as possible" on the limited use of CSAAS evidence.[13] The defense argued in a footnote, that the instruction was "of particular importance now that the prosecution's CSAAS expert suggested to the jury that kids don't make false allegations of sexual abuse." Argument on the motion was held at the conclusion of the trial proceedings on November 22, 2011.[14] During argument, counsel for the defense requested that the instruction be given before his expert testified, since his expert would be addressing CSAAS directly. In response to the prosecution's question about the specific instruction the trial court might give, the court said, "We do have a CALCRIM. And then in the Patino[15] case we have what the Court specifically instructed in that case, which was affirmed." The prosecutor indicated she preferred that the court give the

---

[12] This testimony was given on redirect examination after defense counsel had concluded his cross-examination of Dr. Urquiza by establishing that children do make false allegations about sexual abuse.

[13] The defense requested that the jury be instructed as follows: "(a) The jury may consider the [CSAAS] testimony only for the limited purpose of showing, if it did, that the alleged victim's reactions as demonstrated by the evidence were not inconsistent with her having been molested; [¶] (b) The prosecution still has the burden of proving guilt beyond a reasonable doubt; [¶] (c) [CSAAS] research was based upon an approach that is completely different from that which the jury must take in the [*sic*] criminal matter; [¶] (d) Research pertaining to the [CSAAS] begins with the assumption that a molestation has occurred and seeks to explain common reactions of children to that experience. In contrast, in this matter the jury must presume that the defendant is innocent; [¶] (e) [CSAAS] testimony is not received and must not be considered by the jury as proof that the alleged victim's molestation claim (or claims) is true."

[14] On November 22, several defense witnesses testified, including Brenda, LaValley, and defendant. The court released the jury for the Thanksgiving Holiday until the following Monday, November 28, 2011, and then held a hearing on the motion.

[15] *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747 (*Patino*).

CALCRIM instruction. The defense offered nothing in reply to the court's statement about the instruction it would give.

On the Monday after the Thanksgiving holiday break, just before defense CSAAS expert Dr. O'Donohue took the stand, the trial court instructed the jury using CALCRIM No. 1193 modified slightly to reference the testimony of both experts:

"[Y]ou have heard testimony from Dr. Urquiza *and you are about to hear testimony from Dr. O'Donohue*[16] regarding the [CSAAS].  [¶] This testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of a victim's testimony."

Before deliberations, the trial court instructed the jury consistent with CALJIC No. 10.64[17] that CSAAS evidence "is not received and must not be considered by you as proof that any alleged victim's molestation claim is true.  [¶]  [CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience.  [¶]  As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt.  [¶]  Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that an alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

---

**16**  The italicized language modified the standard CALCRIM No. 1193.

**17**  The instruction has its origin in *Patino*, *supra*, 26 Cal.App.4th at page 1746, footnote 2.

## B. Analysis

On appeal, defendant argues the CSAAS evidence was so irrelevant and prejudicial that it violated his constitutional right to a fair trial and due process of law.[18] (U.S. Const., 5th, 6th, 14th Amends.; Cal. Const., art. I, §§ 1, 7, 15, 16.)  He argues the trial court should have excluded CSAAS evidence because it (1) lacks probative value, (2) usurps the jury's role in determining credibility, (3) may be misconstrued as corroboration of the victims' claims, and (4) lacks empirical support and scientific or professional acceptance.  Defendant then adds contentions that the trial court erred by (5) failing to require the prosecution to identify the misconceptions being targeted, (6) telling the jury that CSAAS evidence could be used " 'in evaluating the believability of a victim's testimony,' " and (7) prohibiting the defense expert from testifying about the exclusion of CSAAS testimony in sister states.  Finally, defendant argues (8) he was prejudiced by the assertedly improper introduction of CSAAS evidence.  We reject the contentions.

### 1. Standard of Review

Defendant acknowledges that the trial court's ruling on admissibility of expert testimony is reviewed for abuse of discretion.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; see also *People v. Bradley* (2012) 208 Cal.App.4th 64, 84.)

Even assuming defendant preserved a due process challenge in the trial court, the essence of a due process violation is denial of a criminal defendant's right to a fair trial,

_____

[18]  Defendant's request in the trial court to " 'federalize' " all relevance objections to deem them to incorporate a due process challenge and his constitutional claims on appeal appear to do no more than add a "constitutional 'gloss' " to his argument in the trial court seeking to exclude or limit the evidence under Evidence Code section 352.  (*People v. Rundle* (2008) 43 Cal.4th 76, 109, fn. 6, overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  In such a case, rejection on the merits of the challenge to the trial court's ruling necessarily leads to rejection of the constitutional claim, and no separate constitutional discussion is required.  (*Rundle*, at p. 109, fn. 6.)

and on appeal, the defendant must demonstrate how his fundamental right to a fair trial was violated by introduction of the CSAAS evidence. (*Patino*, *supra*, 26 Cal.App.4th at p. 1747 [rejected due process challenge to CSAAS evidence, because the defendant failed to demonstrate how his constitutional right to a fair trial was violated by the introduction of CSAAS testimony to rehabilitate the victim's testimony after a rigorous defense cross-examination calling into question the victim's credibility].)

## 2. Probative Value

Though CSAAS evidence is inadmissible to prove a defendant sexually abused a child, it is admissible to disabuse jurors of misconceptions they might hold about how a child reacts to a molestation, and to explain emotional antecedents of abused childrens' seemingly self-impeaching behavior. (*People v. Perez* (2010) 182 Cal.App.4th 231, 245.) CSAAS evidence is admissible to rehabilitate credibility when the defense suggests a child's conduct after the incident is inconsistent with abuse. (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001 (*Sandoval*).) CSAAS evidence simply tells the jury that certain behavior by a child does not necessarily *disprove* an allegation of sexual abuse.

CSAAS evidence must be tailored to address the specific myth or misconception suggested by the evidence. (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.) The prosecution has the burden to identify the myth or misconception, but that burden is satisfied where the child's credibility is placed in issue due to paradoxical behavior. (*Patino, supra*, 26 Cal.App.4th at pp. 1744-1745.)

Though the foregoing cases and many other Court of Appeal cases uphold admissibility of CSAAS evidence, defendant considers it an open question because the California Supreme Court has never directly held CSAAS evidence admissible, though it has upheld evidence regarding parental reluctance to report child molestation (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*)); rape trauma syndrome (*People v.*

29

*Bledsoe* (1984) 36 Cal.3d 236, 247-248); and the behavior of domestic violence victims (*People v. Brown* (2004) 33 Cal.4th 892, 905-908 (*Brown*)).

However, our high court in *McAlpin* held that the evidence at issue in that case was admissible by analogy to the reasoning of Court of Appeal cases holding CSAAS evidence admissible. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) And the court in *Brown* similarly analogized to its earlier analysis in *McAlpin*. (*Brown*, *supra*, 33 Cal.4th at pp. 905-906.)

Here, myths and misconceptions addressed by all components of CSAAS were suggested by the evidence, and Dr. Urquiza's testimony was highly relevant to support the victims' credibility and rebut those misconceptions about how a child victim reacts to sexual abuse. Defense counsel asserted in his opening statement that four of the victims are liars, and that K.N. admitted she lied by recanting her accusation that defendant touched her inappropriately. Defense counsel also told the jury the evidence would show that H.B.1 claimed defendant forced her, K.N., and H.N., to have sex with defendant's son, John, but K.N. and H.N. denied it. Counsel also pointed out that H.B.2 said she and H.B.1 were molested together, but H.B.1 said she was always alone when defendant molested her. Defense counsel hammered on these points in cross-examination of the victims.

The CSAAS evidence was relevant to rebut misconceptions the defense hoped to exploit, e.g., that K.N.'s recantation meant her accusation was a lie; that real victims would have total recall and not have inconsistencies in their statements; that real victims would have reported abuse sooner rather than wait and pile on when they heard other children were reporting abuse. CSAAS was helpful in explaining that delayed reporting does not necessarily disprove the accusation, because of the helplessness in the manipulative or threatening environment often created by an abuser who occupies a position of power over the children, particularly here where it was the children's own parents who placed the children in that environment.

30

Defendant argues CSAAS evidence lacks probative value because its aspects are just as consistent with false testimony as with true testimony. That the "particular aspects of CSAAS are as consistent with false testimony as true testimony" was noted by the court in *Patino*. (*Patino*, *supra*, 26 Cal.App.4th at p. 1744.) Nevertheless, the *Patino* court recognized that CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts and concluded the CSAAS testimony in that case was pertinent because an issue had been raised by the defense as the victim's credibility. (*Id*. at pp. 1744-1745.)

Defendant argues CSAAS has no tendency to prove a material fact but instead is " 'self-nullifying' " in that it tells the jury that, no matter how the child behaved, that behavior is consistent with abuse. Defendant cites an Iowa case which said CSAAS evidence is problematic because "in some instances it seeks to show why the behavior of an alleged abused child is the same as, not different from, the behavior of a child who has never been abused. The testimony may seek to explain why the child acted normally. [Citation.] The fact a child acted normally is not evidence of abuse." (*State v. Stribley* (Iowa Ct.App. 1995) 532 N.W.2d 170, 174.) The Iowa court opinion does not bind us (*People v. Mays* (2009) 174 Cal.App.4th 156, 167 (*Mays*)), and the quotation reveals the Iowa court's (and defendant's) misperception of the proper use of CSAAS in court, which is simply to tell the jury that certain behavior is not necessarily inconsistent with an abuse allegation. Moreover, contrary to defendant's claim, the Iowa court did not exclude use of CSAAS evidence. There, a doctor testified for the prosecution that photographs supported a conclusion that there had been vaginal penetration and trauma to the hymen. (*Stribley*, at pp. 171-172.) A doctor testifying for the defense opined that no such conclusion could be drawn from the photographs. (*Id*. at p. 172.) On cross-examination of the defense expert, the prosecutor elicited -- without objection -- testimony about CSAAS. (*Id*. at p. 173.) On appeal, the defendant claimed ineffective assistance of counsel in trial counsel's failure to object. (*Id*. at p. 173.) The Iowa court

31

said some (unspecified) portions of the CSAAS evidence would have been excluded had defense counsel objected, but the defendant failed to show prejudice, and so the appellate court affirmed the judgment. (*Id*. at p. 174.)

Defendant acknowledges that the United States Supreme Court rejected a due process challenge to battered child syndrome (*Estelle v. McGuire* (1991) 502 U.S. 62, 68-70 [116 L.Ed.2d 385]), and California courts consider battered child syndrome analogous to CSAAS evidence (*Patino*, *supra*, 26 Cal.App.4th at p. 1747; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*)). Defendant disagrees with the analogy, arguing battered child syndrome is different in that it is a diagnostic tool indicating that serious, repetitive injuries to children are intentional, not accidental, and does not identify a perpetrator. In contrast, CSAAS describes characteristics shared by children who were not sexually abused and singles out a particular perpetrator because the components of secrecy, entrapment, etc., can relate only to the abuser identified by the child. However, any distinctions between the two syndromes do not defeat the fairness of allowing CSAAS evidence in this case.

Here, introduction of the CSAAS evidence did not deprive defendant of a fair trial. In addition to cross-examining the victims, defense counsel also cross-examined the prosecution's expert at length, presented the defense's own expert, and vigorously argued the evidence suggested the victims' testimony was untrustworthy. There was no due process violation.

We reject defendant's contention that the CSAAS evidence lacks probative value and his contention that its admission violated his due process rights.

### 3. Claim of Usurpation of Jury's Role

Citing only a Pennsylvania case, *Commonwealth v. Dunkle* (1992) 529 Pa. 168 [602 A.2d 830], defendant argues CSAAS in effect usurps the jury's role to determine witness credibility, even though it is not supposed to do so. Case law from sister states is not binding on us, though we may consider it. (*Mays*, *supra*, 174 Cal.App.4th at p. 167.)

32

The *Dunkle* court's concern with CSAAS evidence was that it should not be used to prove the child had in fact been sexually abused, and that it was not necessary on the issue of delayed or incomplete disclosure, which the *Dunkle* court viewed as within the grasp of lay people. (*Dunkle*, at pp. 175, 177, 181-182 [*id.* at pp. 833-834, 836].)

In this case, the CSAAS evidence was not used to prove sexual abuse had occurred. In fact, Dr. Urquiza himself told the jury such use of CSAAS would be inappropriate. He further testified that he had not interviewed the children in this case, never met them, and never read any police reports associated with this case. Moreover, to prevent improper use of CSAAS testimony, the trial court instructed the jury that the CSAAS evidence "is not received and must not be considered by you as proof that any alleged victim's molestation claim is true. [¶] [CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. [¶] As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. [¶] Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that an alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

A similar claim of usurpation of the jury's role was made in a recent habeas corpus case in the federal district court in the Eastern District of California, *Gucciardo v. Knipp* (E.D.Cal. Jan. 28, 2015, No. 2:13-cv-00323 AC) 2015 WL 403852. At issue in that case was the admissibility of CSAAS testimony given by Dr. Urquiza. The court rejected defendant's claim that the doctor's testimony (which was similar to his testimony here) invaded the jury's province. (*Id*. at pp. *13-*14.) The court specifically noted that Dr. Urquiza "was not familiar with the victim, had not read the documents related to the case, and was not offering an opinion as to whether she had been molested." (*Id*. at

33

p. *13.)  Rather, as here, "[t]he heart of Urquiza's testimony was a generalized account of the syndrome and its impact on an abused child."  (*Ibid*.)  "Such expert opinion did not invade the jury's province, denying defendant a fair trial."  (*Id*. at p. *14.)  Our view of the evidence in this case is the same.

The CSAAS evidence in this case did not usurp the jury's role.

### 4.  Claim that CSAAS Evidence Corroborates Victims

Defendant argues CSAAS evidence can easily be misconstrued as corroboration of a victim's claims, because an opinion on whether the victim's behavior was typical of a molestation victim is closely related to the ultimate question of whether this victim was abused by this abuser.  (*People v. Housley* (1992) 6 Cal.App.4th 947, 958 (*Housley*).)

The court in *Housley* noted that expert testimony about CSAAS could be misconstrued by the jury as corroboration for the victim's claims and might unfairly tip the balance against defendant where the case boiled down to the victim's word against the defendant's word.  (*Housley*, *supra*, 6 Cal.App.4th at p. 958.)  However, the *Housley* court said a simple instruction, as used in a prior case, "would clearly define the proper use of such evidence and would prevent the jury from accepting the expert testimony as proof of the molestation."  (*Ibid*., citing *Bowker*, *supra*, 203 Cal.App.3d 385.)  The court in *Housley* concluded the trial court had a duty sua sponte to instruct that (1) CSAAS "evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested," and (2) "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true."  (*Housley*, at p. 959.)

Here, as indicated, the jury received that instruction.

### 5.  Empirical/Professional/Scientific Support

Defendant argues CSAAS is "junk science" that is not universally "condoned."  However, when discussing the admissibility of battered womens syndrome testimony, our

high court in *Brown* said admissibility does not depend on a showing based on a "recognized 'syndrome.' " (*Brown*, *supra*, 33 Cal.4th at pp. 905-906.)

Defendant cites *Lantrip v. Commonwealth* (Ky. 1986) 713 S.W.2d 816, but there the Kentucky court rejected use of CSAAS to prove that sexual abuse actually occurred -- a use not at issue in this case. (*Id*. at p. 817.) Defendant asserts some states reject CSAAS evidence, though he acknowledges that other states allow it. We adhere to the view expressed by California courts and reject the view expressed in the sister state cases upon which defendant relies.

## 6. Delayed Disclosure

Defendant considers CSAAS evidence unnecessary on the issue of delayed disclosure, because according to him, everyone knows delayed disclosure is common in child sex abuse. He submitted to the trial court a law review article stating that a sampling of the general public and of jurors suggested that laypeople tend to believe delayed disclosure is common. However, Dr. Urquiza testified -- on cross-examination by the defense -- that other research suggests the general public is not well-informed, and Dr. Urquiza's own experience is that parents do not understand why their children did not tell them about sexual abuse. Defendant fails to show sufficient common knowledge to nullify the probative value of CSAAS on the issue of delayed reporting.

## 7. Identification of Misconceptions

Defendant complains the trial court failed to require the prosecution to identify the misconceptions it was targeting, in order to determine whether each misconception was beyond common experience such that expert opinion would assist the trier of fact. Defendant notes CSAAS has been around a long time, since the early 1980's, and his cited law review article indicated most people now understand delayed disclosure. We have already rejected defendant's argument that the general public does not need expert testimony on the issue of delayed disclosure. We reject his claim as to other misconceptions as well.

35

**8. Preclusion of CSAAS Evidence in Other States**

Defendant argues the trial court intensified the purportedly erroneous admission of CSAAS evidence by prohibiting the defense expert from testifying that sister states' judicial systems exclude CSAAS testimony. According to defendant, exclusion of testimony that other states have rejected CSAAS gave the jury a false sense of CSAAS's reliability. However, even assuming defendant's expert psychologist was qualified to render legal opinions (which he was not), any such testimony lacks probative value and presented a substantial danger of misleading the jury as to California law and thus was properly precluded under Evidence Code section 352.

**9. Jury Instruction on CSAAS**

Defendant complains the trial court "exacerbated its error in admitting the CSAAS evidence" by instructing the jury, right before the defense CSAAS expert testified, "You may consider this evidence only in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of a victim's testimony." Defendant says the instruction affected his substantial rights, thereby allowing him to raise it on appeal despite his failure to object in the trial court. (§ 1259; *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7.)

However, defendant did not merely fail to object; the defense itself requested that a similar instruction be given.[19] And from the record, it appears that defense counsel

---

[19] See fn. 14, *ante*. Defendant's instruction provided that CSAAS evidence could only be used for the limited purpose of "deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested," but it did not say that the evidence could be used for evaluating the believability of the victim's testimony. But this additional language is actually somewhat redundant. The reason the evidence is admitted to show that the victim's conduct is not inconsistent with having been molested is because inconsistent conduct might otherwise be viewed as an indication that the victim's testimony about having been molested lacks credibility. (See *Sandoval*, *supra*, 164 Cal.App.4th at pp. 1001-1002 ["CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct

acquiesced in the specific instruction the court gave -- CALCRIM No. 1193. In any event, we note that counsel's own proffered instruction also contained the language about which he now complains about on appeal. As for the timing, the defense made the request for the instruction just before the Thanksgiving Holiday recess. Defense counsel expressly requested that the instruction be given just before his expert testified on the following Monday. Counsel made this request because his expert would be addressing CSAAS "specifically." Any error is invited, and defendant cannot raise it on appeal. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.)[20]

### 10. Claim of Prejudice

Defendant argues he was prejudiced by the erroneous admission of CSAAS evidence. As we have said, there was no error.

We conclude defendant fails to show grounds for reversal based on introduction of CSAAS evidence.

## II. Exclusion of Evidence of the Victims' Mental Health

Defendant argues the trial court prejudicially erred in excluding evidence about the psychiatric diagnoses and treatment of four of the victims. Defendant maintains he was deprived of his constitutional rights to due process, compulsory process, confrontation, and a fair trial. We disagree.[21]

---

after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' "].)

[20] Insofar as defendant otherwise seeks to challenge the jury instructions, he has forfeited the challenge by failing to present it under a separate heading in his brief and failing to cite any legal authority. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29; Cal. Rules of Court, rule 8.204(a)(1)(B).)

[21] We have reviewed the portions of the record sealed by the trial court.

## A.  Background

Before trial, the defense subpoenaed psychological, psychiatric, clinical, prescription, and other medical records of H.N., K.N, H.B.1, and H.B.2.  The victims asserted physician-patient privilege under Evidence Code section 992 (not at issue on appeal) and the psychotherapist-patient privilege under Evidence Code section 1014.

The trial court reviewed the records in camera, found defendant's need for cross-examination outweighed state policies of privilege and privacy, and provided the materials to both sides pursuant to a protective order and agreement to be bound.

The defense then moved to adduce evidence at trial of the psychiatric diagnoses and treatment of these four victims.  The defense asserted the evidence was important to test the victims' credibility because behaviors associated with these disorders included lying and framing others for their own misconduct.

After the trial court's tentative ruling to exclude the diagnoses, defendant asserted it needed the mental health diagnoses in order (1) to rebut any prosecution evidence that the Danielses ran a cruel " 'boot camp' " for "naughty" children when in fact the Danielses were "educated" providers for children with mental health issues; (2) to rebut any prosecution attempt to impeach LaValley's motivation for referring children to the Danielses; and (3) to cross-examine the prosecution's expert about CSAAS's applicability to children with mental health issues.

The prosecutor disputed the proffered evidence and reiterated the privilege and privacy concerns.[22]

The trial court affirmed its tentative ruling that any diagnosis was privileged and inadmissible, but witnesses could be questioned as to whether any of the children had

---

[22] For purposes of this appeal, we assume the evidence of diagnoses was reliable.

issues with lying or manipulation -- which were traits of the diagnosed condition -- without mentioning a particular diagnosis.

The trial court also ruled the defense could admit evidence about the medications prescribed for the victims that had the potential to affect perception, memory, and ability to recall, all going to credibility.

## B. General Standards

Defendant claims he was deprived of his constitutional rights to due process, compulsory process, confrontation, and a fair trial (U.S. Const., 5th, 6th, 14th Amends.).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.] ('The Constitution guarantees a fair trial through the Due Process Clauses, but it defines basic elements of a fair trial largely through the several provisions of the Sixth Amendment')." (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636].)

"The Sixth Amendment to the [federal] Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings . . . . [¶] . . . [¶] Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d 347, 353].)

" ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-

examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " [Citations.]  However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.  [Citation.]  California law is in accord.  [Citation.]  Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' " (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1050-1051 (*Carpenter*).)

### C.  Analysis

"When a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon, as in *Davis* [*v. Alaska*, *supra*, 415 U.S. at p. 319], to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1127 (*Hammon*).)

Evidence Code section 1014 states that a psychotherapy patient "whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."  Evidence Code section 1012 states that " 'confidential communication' " includes "a diagnosis made and the advice given by the psychotherapist in the course of that relationship."  The psychotherapist-patient privilege is not absolute but is broadly construed in favor of the patient. (*People v. Castro* (1994) 30 Cal.App.4th 390, 396-397, overruled on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)  For example, in *Castro*, a prosecution for lewd conduct with a child, the trial court properly excluded testimony of child's therapist that the child was lying and her allegations were the projection of her

40

own " 'severe emotional problems.' " The court held that the therapist's opinion that the victim suffered from " 'severe emotional problems' " was a " 'diagnosis' " with the meaning of Evidence Code section 1012 and therefore privileged. (*Castro*, at p. 397.)

Indeed, " 'the use of psychiatric testimony to impeach a witness is generally disfavored.' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 575.) "It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' [Citation.]" (*Id.* at p. 579.) *Anderson* was a murder case in which the trial court permitted a sometimes-delusional witness to testify about a prior uncharged murder committed by the defendant. (*Id.* at pp. 570-571.) The Supreme Court held the trial court properly sustained a relevancy objection when defense counsel asked the witness if she was in therapy. (*Id.* at pp. 578-579.) "Even if examination of a witness about treatment for mental illness might sometimes be relevant, here evidence that [the witness] had received therapy would have added little to the specific evidence, largely undisputed, that she had significant fantasies. Defense counsel was allowed to cross-examine [the witness] fully about the specific delusions that might impair the accuracy of her testimony. Nothing more was necessary." (*Id.* at p. 579.)

In this case, defendant fails to show a constitutional violation. He argues the diagnoses were relevant. However, mere relevance is not the test. Rather, the inquiry is whether defendant had a need for cross-examination about specific psychiatric diagnoses sufficient to outweigh the state policies disfavoring cross-examination about psychiatric diagnoses and treatment. (See *Hammon, supra*, 15 Cal.4th at p. 1127.) Defendant must show that the prohibited cross-examination would have produced a significantly different impression of the witnesses' credibility. (*Carpenter, supra*, 21 Cal.4th at pp. 1050-1051.)

41

Defendant asserts the diagnoses were relevant (1) to impeach the victims' credibility, (2) to counter the prosecution's attempt to impeach LaValley's motivation in referring children to the Danielses, (3) to dispel the notion that the Danielses ran a " 'cruel boot camp' " and to explain their "therapeutic" relationship with the children, and (4) to cross-examine the prosecution's CSAAS expert about CSAAS's application to children with these particular diagnoses.

As to defendant's first point about impeaching credibility, the diagnoses would be merely cumulative to the evidence that four of the victims had mental health problems. That testimony included testimony of the victims and their parents admitting that the children were sent to the Danielses' home because the children had behavioral and control problems that were beyond the adopted parents' ability to cope. The behavioral problems included lying and making up stories. This testimony corroborated Brenda Daniels' testimony that the children were out of control -- lying, destructive, manipulative, and controlling. Additionally, the defense presented LaValley's testimony that the four victims were liars and manipulators and were seeing a psychiatrist who prescribed medications for them. A defense expert described these types of medications as being designed to control various psychiatric disorders and having potential side effects affecting memory. In closing argument, defense counsel repeatedly referred to the victims' having "significant mental health issues" and taking "antipsychotic medications." Defendant fails to show he needed to identify any particular diagnosis.

As to defendant's fourth point, although defense counsel was precluded from asking the prosecution's CSAAS expert about application of CSAAS to children with particular psychiatric diagnoses, he was able to elicit that the expert was unaware of any studies as to whether CSAAS applied to children taking the types of medications which the jury learned had been prescribed for these victims.

As to defendant's second and third points -- about LaValley's motivation in referring children to the Danielses and the "boot camp" perception -- defendant fails to

42

show how identification of any psychiatric diagnosis was necessary to his defense. Defendant was not charged with child abuse other than the sexual abuse. The relevance of the evidence was that (1) it provided further explanation for delayed disclosure of the molestations by children who feared defendant, and (2) it went to defendant's credibility. As the prosecutor argued to the jury, one victim testified she did not disclose the molestation right away because she assumed it was part of the punishment. As to defendant's credibility, the boot camp rumor led to the removal of the foster child and the license revocation, about which defendant's version of events (both before trial and during his trial testimony) differed from the social worker whom defendant threatened with a gun and the ALJ. In closing argument to the jury, the prosecutor used the discrepancies to attack defendant's credibility.

Defendant argues he should have been allowed to defend his use of seemingly harsh methods by showing that he attended a seminar and followed methods used by "therapy advocate" Nancy Thomas, though he admits those methods have been criticized by others. He argues that any dispute about their validity is "beside the point" here since the Danielses as well as the children's therapists and parents all relied upon them. However, it is not beside the point. On appeal, defendant himself refers to a website which states that Nancy Thomas has no formal training in psychotherapy and no academic credentials, and that the methods she advocates are considered by "many" child protective agencies as cruel and inhumane. (http://www.childrenintherapy.org/proponents/thomasn.html [as of June 25, 2015].) If defendant were allowed to present his evidence, the prosecution would have to be allowed to refute it and perhaps even introduce evidence of more recognized treatment strategies for the victims' diagnosed disorders, which would have resulted in a "trial within a trial" on a collateral matter.

Defendant offers a string of case citations for general legal principles, with little analysis. None helps his appeal. Citing *Michigan v. Lucas* (1991) 500 U.S. 145, 149

[114 L.Ed.2d 205], defendant acknowledges the principle that the right to present defense witnesses and testimony is not absolute and must bow to accommodate other legitimate interests in appropriate circumstances. That rape case involved a Michigan state law authorizing preclusion of evidence of a defendant's own past sexual relations with a victim, if the defendant failed to comply with the statute's notice-and-hearing requirement. The United States Supreme Court held the lower court erred in viewing preclusion as a *per se* violation of the Sixth Amendment. The notice-and-hearing requirement served legitimate state interests in protecting against surprise, harassment, and undue delay, and failure to comply "may in some cases justify even the severe sanction of preclusion." (*Id*. at p. 153.)

Defendant cites *United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867, 871-873 [73 L.Ed.2d 1193], for the general proposition that a state may not arbitrarily deny a defendant the ability to present relevant and material evidence that is vital to the defense. The court in that case held that the government's deportation of an alien witness did not violate the defendant's rights to compulsory process or due process, where the defendant did not present a plausible explanation of how the deported person's testimony would have been material and favorable to the defense. (*Id*. at pp. 867, 871-873.)

Other cases cited by defendant are similarly unhelpful to his appeal. (*Green v. Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738] [due process was violated in penalty phase of a death penalty case by exclusion of highly relevant and critical evidence that a witness heard an admission from another defendant who admitted killing the victim after sending the defendant on an errand]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297] [due process was violated where trial court applied state law to preclude defendant from eliciting evidence that third party had admitted being the perpetrator]; *Smith v. Illinois* (1968) 390 U.S. 129 [19 L.Ed.2d 956] [trial court denied defendant's confrontation right by precluding the defense from asking the principal prosecution witness for his true name and address after the witness admitted the name he

44

gave was false]; *Washington v. Texas* (1967) 388 U.S. 14, 18-19 [18 L.Ed.2d 1019] [Texas statute barring defendant from presenting accomplice as defense witness violated Sixth Amendment right to have compulsory process for obtaining witnesses]; *Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923] [14th Amendment makes federal Confrontation Clause applicable to states].)

Here, the defense was allowed to elicit evidence of the victims' behaviors related to their mental health and the potential effect on the victims' credibility. The excluded evidence of particular diagnoses would not have produced a significantly different impression of the case, and the trial court's ruling did not violate defendant's constitutional rights.

### III. Sufficiency of Evidence as to Counts 8, 9, 10, 11, and 12

Defendant contends the evidence as to Counts 8 through 12 was constitutionally insufficient. We disagree.

### A. Standard of Review

Convictions must be supported by substantial evidence, i.e., "evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 577-578.) On appeal, we view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; *Johnson*, at p. 576.) "Conflicts and *even testimony which is subject to justifiable suspicion* do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403; see also *People v. Barnes* (1986) 42 Cal.3d 284, 306, italics added.)

In *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), the court held that generic testimony in child sexual abuse cases is constitutionally sufficient, as long as the complaining witness describes: (1) the kind of act or acts committed with sufficient specificity to assure it was an unlawful act and a specific type of proscribed conduct; (2) the number of acts with sufficient certainty to support each of the alleged counts; and (3) the general time period in which the acts occurred to assure they were committed within the applicable statute of limitations. (*Id*. at p. 316.)

### B.  Counts 8, 9, and 10 - H.B.1

These are two counts of touching H.B.1's vagina in the bathroom and one count of touching her vagina on her birthday.

Defendant acknowledges the evidence was "supposedly constitutionally sufficient" under *Jones*.  He acknowledges it is the exclusive province of the jury to determine witness credibility and the truth or falsity of the facts upon which that determination depends.  (*Jones*, *supra*, 51 Cal.3d at p. 314)  He nevertheless argues the moral sense of this court should be "shock[ed]" by the conviction.  He cites *People v. Watts* (1999) 76 Cal.App.4th 1250, which stated an appellate court will not reject a witness's testimony, believed by the jury, unless there is a physical impossibility the statement is true, or the statement shocks the moral sense of the court, or the statement's inherent improbability plainly appears.  (*Id*. at pp. 1258-1259.)

Defendant argues our moral sense should be shocked, because H.B.1 made the following "outlandish" claims in her SAFE interview:

(1) That she and other girls had been forced to rub up against each other, whereas the others denied any such event;

(2) That defendant stabbed Brenda with a knife, splitting her shoulder open;

(3) That defendant's mother deliberately tried to set the house on fire (by putting foil in the microwave) because she was mean;

46

(4) That defendant forced her to "have sex" twice with a boy in the house, age 12 or 13, though her genital examination was normal; and

(5) That it was on the news that defendant abused 150 girls and had pornography on his computer, though no pornography was found.

Defendant says the victim "backtracked" at trial, testifying:

(1) She did not remember whether she had acted out sexually but H.N. told her it happened;

(2) She heard about Brenda being stabbed from others, though she did not say so in the SAFE interview;

(3) The first microwave fire may have been an accident, but the others were not;

(4) Perhaps she heard about the 150 girls and pornography from DeRose or DeRose's computer rather than seeing it on the news.

None of the points raised by defendant present a physical impossibility that defendant molested this victim, nor do they shock our moral sense.

### C. Counts 11 and 12 - H.B.2

These counts alleged defendant directed H.B.2 to touch her vagina. Again, defendant acknowledges the evidence is constitutionally sufficient, but he argues our moral sense should be shocked because H.B.2 said H.B.1 was usually present, and H.B.1 testified to the contrary that she was always alone when molested and never saw defendant do it with anyone else. Defendant argues that, when one additionally considers that H.B.2 had "visions," moral confidence in the verdicts should be shaken.

Defendant's appellate argument overlooks the testimony that H.B.1 testified she would "shut down" and try to block it out when the molests occurred and tried not to let herself remember. The jurors could have reasonably inferred that this -- as well as the passage of time for these young victims -- may have explained why H.B.1 and H.B.2 had different recollections.

47

The jury was able to listen to the testimony of these witnesses and observe their demeanor, facial expressions, and emotional responses. The record indicates that testifying in court was difficult for the girls.

We conclude substantial evidence supports the convictions on all counts.

## IV. Courtroom Security

Defendant argues the trial court prejudicially erred by having a uniformed officer sit about three feet behind defendant throughout the trial, without any individualized finding of necessity. We disagree.

### A. Background

During a break in jury selection, defense counsel told the court:

"I wanted to raise the issue of the position of the escort officer. I am mindful of the security issues. But [defendant] comes to this case with no criminal history. His behavior has been exemplary. I am sure the court has noticed that.

"I think that it is a problem when the escort officer is essentially right behind him, in front of the jury. I don't think we have a problem with [defendant] doing anything inappropriate, and I would simply ask that the court allow or order, whatever the appropriate terminology would be, that have the officer just sit back and give us a little space.

"I do feel that his being right behind us sets a bad -- sends a message to the jury that is prejudicial to the defense in this case."

The trial court stated: "I do inform the jury, and I will as my standard procedure inquire of them as to whether an officer sitting immediately behind [defendant] will impact their ability to be fair and impartial. I haven't done that yet just because we have just gotten started, but I will do that. [¶] I find that the officer now is maybe two and a half -- I can't tell for sure -- two and a half to three feet behind [defendant]; is that fair?"

Defense counsel agreed to the estimate and stated, "I don't think that it is necessary for him to be in such a direct proximity to [defendant]. I just don't think there

48

is any security issue that really involves [defendant]. He is not going anywhere. I would point out that in 2005 and in 2010 he self-surrendered to the officers when we -- because I represented him both times -- when we were made aware there was an allegation. [¶] He's not going anywhere. He's here to fight for his innocence, and he's not going to do anything that would jeopardize his own case. He has strong incentive to behave. [¶] I think the subliminal messages notwithstanding the Court's admonition to the jury, the strong subliminal message a jury could take away from this is that he is in some way dangerous because there is an officer essentially sitting within arm's length. I just think in this particular case, with [defendant], that a little more space would be appropriate."

The trial court responded: "In terms of the security within the courthouse, of course we have different levels of security, depending on the nature of the particular defendant and the charges. Sometimes we have two escort officers, sometimes they sit within six inches of the defendant or defendants. [¶] *I will consider this*, but at least right now, given the position of this particular officer, I don't find that it is in any way oppressive or suggestive. [¶] I will examine the panel with respect to that issue. I always tell them it is standard operating procedure in the courthouse. But your objection and comments are noted for the record." (Italics added.)

The trial court told the panel, "I want to advise you that the fact that an officer is sitting behind the defendant is of no consequence to you. An officer is present in every case in which a defendant is held in custody in this courthouse. It is standard operating procedure. It is not in any way evidence of guilt and no inference of guilt should be made by any of you as a result of an officer being present." The trial court asked if defendant's being in custody would affect anyone's ability to be fair and impartial, got no response, but did not expressly inquire if the officer's presence would affect their ability to be fair and impartial.

## B. Analysis

"Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion. [Citations.] [¶] Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. [Citations.]" (*People v. Hernandez* (2011) 51 Cal.4th 733, 741-742 (*Hernandez*).)

But "the stringent showing required for physical restraints like shackles *is the exception, not the rule*. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need." (*People v. Stevens* (2009) 47 Cal.4th 625, 633 (*Stevens*), italics added.) Other security measures may not require such justification and instead reside in the sound discretion of the trial court. (*Id.* at pp. 633-634.) ) "[F]or example, [] the presence of armed guards in the courtroom would not require justification on the record '[u]nless they are present in unreasonable numbers.' [Citations.] The United States Supreme Court also distinguishes between security measures, such as shackling, that reflect on defendant's culpability or violent propensities, and other, more neutral precautions.[23] Measures such a shackling or the appearance of the defendant in jail garb are inherently prejudicial and are subject to exacting scrutiny [citation], but precautions such as the use of additional armed security

---

[23] Citing *Holbrook v. Flynn* (1986) 475 U.S. 560, 569 [89 L.Ed.2d 525].

forces are not, because of 'the wider range of inferences that a juror might reasonably draw from the officers' presence.' . . . 'While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that [the] defendant is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance[24] from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citations.]' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 995-996.)

The court in *Stevens* held that stationing a courtroom deputy next to the witness stand during the defendant's testimony was not an inherently prejudicial practice requiring justification by a showing of manifest need. (*Stevens*, *supra*, 47 Cal.4th at p. 629.) The *Stevens* court rejected the defendant's argument that the deputy's presence was akin to a " 'human shackle.' " (*Ibid*.) The *Stevens* court cited with approval *People v. David* (1939) 12 Cal.2d 639, 644 (*Stevens*, at p. 634). In *David*, the court rejected a similar argument where a sheriff and deputies accompanied the defendant into the courtroom, and one deputy followed the defendant inside the rail and took a seat immediately behind him. The *David* court rejected the defendant's comparison to

---

**24** In *Holbrook v. Flynn*, the court cited with approval a federal case which found no abuse of discretion where the officer was seated three feet from the defendant. (*Holbrook*, at p. 569, citing *Hardee v. Kuhlman* (2d Cir. 1978) 581 F.2d 330, 332.)

51

shackling and found nothing to show that the deputy's conduct prejudiced the defendant in any way. (*David*, at p. 644.)

The *Stevens* court stated, "so long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings." (*Stevens*, *supra*, 47 Cal.4th at p. 639, fn. omitted.)

However, in the context of stationing a deputy next to a testifying defendant, the *Stevens* court cautioned that "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy." (*Stevens*, *supra*, 47 Cal.4th at p. 644.) "The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. . . . [T]he trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury. 'It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to [United States Supreme Court precedent], provides the appropriate guarantee of fundamental fairness.' [Citation.] The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no sua sponte duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. [Citation.]" (*Id.* at p. 642.)

The *Stevens* court explained: "Any discretionary ruling must take into account the particular circumstances of the individual case and will be reviewed in that context.

52

However, if a practice is not inherently prejudicial, it need not be justified by a compelling case-specific showing of need. [Citations.] . . . 'All a . . . . [reviewing] court may do in such a situation is look at the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.' [Citation.]" (*Stevens*, *supra*, 47 Cal.4th at pp. 637-638.)

Following *Stevens*, the California Supreme Court held in *Hernandez*, *supra*, 51 Cal.4th 733 that the trial court abused its discretion in stationing a deputy at the witness stand during the defendant's testimony, based on routine security policy, but the error was harmless. (*Id*. at pp. 744, 748.) The trial court stated a deputy always stands at the witness stand during a defendant's testimony in every case the judge had presided over, even in petty theft cases, and all defendants " 'deserve' " to have a deputy stationed at the witness stand. (*Id*. at p. 743.)

Since our Supreme Court has held there is no inherent prejudice when an officer shadows a defendant on the witness stand, then clearly there is no inherent prejudice when the officer sits through the trial a few feet behind the defendant at the defense table. Defendant does not contend the officer followed him to the witness stand.

Defendant argues that, even if the heightened standard does not apply, the trial court abuses its discretion when it orders heightened measures based on a standing practice without stating on the record the reasons why the need for that security measure outweighs the potential prejudice to the defendant. Defendant quotes from *Hernandez*, *supra*, 51 Cal.4th at page 744, " 'Where it is clear that a heightened security measure was ordered based on a standing practice, the order constitutes an abuse of discretion, and an appellate court will not examine the record in search of valid, case-specific reasons to support the order.' "

However, there was no "heightened" security measure in this case. Furthermore, the trial court did consider this particular case. The trial court said the court had different levels of security, depending on the nature of the particular defendant and the charges, and the level of security being used in this case was more relaxed than in other cases, where they sometimes have two escort officers or an officer sits within six inches of the defendant.

Additionally, defendant fails to show any actual prejudice. As the *Stevens* court noted, "jurors have become accustomed to seeing security officers in public places such as the courtroom [citation], and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant. Because security officers are now 'ordinary and expected' in the courtroom [citation], jurors may view the sight of an officer accompanying the defendant to the witness stand as nothing more than a routine measure." (*Stevens*, *supra*, 47 Cal.4th at p. 638.) Here, the trial court actually informed the jury that the deputy's presence was routine. The court further admonished the jury that the deputy's presence was not evidence of guilt and that the jury was not to infer guilt from this circumstance. Defendant does not claim or cite anything in the record to suggest that the deputy said or did anything that would brand him as a dangerous man. While in its admonition, the trial court referenced that this routine practice takes place in every case where a defendant is in custody, given the allegations in the case and the involvement of parents who had placed their children in defendant's home, the jury could have thought the deputy's presence was just as much for defendant's protection or courtroom disturbances as for anything else.

We conclude the trial court did not abuse its discretion and there was no prejudice.

## V. Claim of Cumulative Prejudice

Defendant maintains he was prejudiced by the cumulative effect of the claimed errors. Having reviewed all contentions, we find no errors resulting in cumulative prejudice.

## VI.  HIV/AIDS Test

Defendant contends the trial court erred in ordering that he submit to HIV/AIDS testing (§ 1202.1), since the nature of his misconduct would not have subjected anyone to that risk.  The Attorney General agrees and so do we.

A court may order HIV/AIDS testing for section 288 convictions only "if the court finds there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim." (§ 1202.1, subd. (e)(6)(A).)  The probable cause standard is "whether the facts known would lead a person of ordinary care and prudence to entertain an honest and strong belief that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim."  (*People v. Butler* (2003) 31 Cal.4th 1119, 1127 (*Butler*).)  We defer to the trial court's factual findings were supported by the record but exercise our independent judgment in applying the particular legal standard to the facts as found.  (*Id.* at p. 1127.)

Here, the trial court made no express findings of probable cause but merely noted the probation report did not recommend such a test and asked for the parties' positions.  The prosecutor, after conferring with the only victim present at the sentencing hearing, asked for the test.  Thereafter, the trial court asked if the matter was submitted.  Defense counsel replied, "I would just note that the nature of the conduct would not have subjected anyone to that risk and submit it."  The trial court ordered the test.

As defense counsel noted, nothing in the record suggests any possibility of transmission of defendant's bodily fluids to the victims.  Further, the court made no express finding of probable cause and we see nothing supporting an implied finding. (*People v. Caird* (1998) 63 Cal.App.4th 578, 590 [evidence supported implied finding of probable cause where semen could have been transmitted when defendant put penis between victim's thighs and attempted to penetrate her].)

Accordingly, on this record the testing order is invalid.

Defendant asks us to strike the testing order from the court minutes, amend the judgment, and order that if a test has already been performed and the results already disseminated, those who received the results be ordered to destroy or return them. Apparently recognizing that the prosecution had been placed on notice of the need to establish probable cause by defense counsel's statement to the trial court and there is nothing in the record which suggests that probable cause could be established if the case were remanded, the People do not seek remand as was authorized in *Butler*, *supra*, 31 Cal.4th at page 1129.

Accordingly, we order that the HIV/AIDS testing order be stricken. However, we reject defendant's request that we order test results that may have been disseminated to third parties destroyed or returned. Those people or entities are not parties to this case and the court has no jurisdiction over them.

## VII.  Jail Booking and Classification Fees

Defendant's opening brief challenges the trial court's imposition of main jail booking and classification fees under Government Code section 29550.2. But as defendant concedes, he did not raise this issue in the trial court. Accordingly, the claim is forfeited. (*People v. McCullough* (2013) 56 Cal.4th 589, 591.)

## DISPOSITION

The section 1202.1 testing order is reversed.  The trial court is directed to amend the minutes and abstract of judgment to delete the order and transmit the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is affirmed as modified.


                                                          MURRAY              , J.


We concur:


         MAURO             , Acting P. J.


         HOCH              , J.